Gerald Maltz (004908)
Stanley G. Feldman (000838)
**Miller, Pitt, Feldman & McAnally, PC**
One South Church Avenue, Suite 1000
Tucson, AZ  85701
T:  (520) 792-3836
F:  (520) 624-5080
Email: sfeldman@mpfmlaw.com
         gmaltz@mpfmlaw.com

David M. Halbreich (*pro hac vice pending*)
David E. Weiss (*pro hac vice pending*)
Matthew D. Rosso (*pro hac vice pending*)
Margaret McDonald (*pro hac vice pending*)
**Reed Smith LLP**
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
T:  (213) 457-8033
F:  (213) 457-8080
Email:  DHalbreich@ReedSmith.com
         DWeiss@ReedSmith.com
         MRosso@ReedSmith.com
         MMcDonald@ReedSmith.com

*Attorneys for PHH Mortgage Corporation*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| PHH Mortgage Corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **1. AIDING AND ABETTING TORTIOUS CONDUCT;** |
| Arch U.S. MI Service, Inc., | |
| Defendant. | **2. EQUITABLE INDEMNIFICATION; and** |
| | **3. UNJUST ENRICHMENT** |
| | **[JURY TRIAL REQUESTED]** |

Plaintiff PHH Mortgage Corporation ("PHH" or "Plaintiff"), by its undersigned counsel, brings this action against Defendant Arch U.S. MI Services, Inc. ("Arch") and, in support thereof, allege as follows:

## I.      NATURE OF THE DISPUTE

1.      This is an action against Arch for its aiding and abetting of PMI Mortgage Insurance Company's ("PMI") bad faith claims handling practices and claim determinations under certain mortgage insurance policies.  PMI is a mortgage insurance company and Arch handles all of PMI's claims and makes claim decisions for PMI.  Arch has been actively aiding and abetting PMI with its bad faith behavior since in or around 2014.  PHH files this complaint for aiding and abetting tortious conduct, equitable indemnification, and unjust enrichment arising out of Arch's assistance and encouragement of PMI's bad faith breach of its contractual obligations to pay losses on defaulted loans under the terms of first-lien mortgage insurance policies issued by PMI.

2.      Mortgage insurance protects lenders and other investors in mortgage loans against financial losses caused by borrowers defaulting on their mortgage payments.  Generally, mortgage insurance pays a percentage of the unpaid principal balance of the defaulted mortgage and unpaid interest on the loan that accrued up to the date a claim is filed.  Claims are generally filed after title has transferred, whether by foreclosure, short sale, deed in lieu of foreclosure, or some other event that transfers title.

3.      PHH is a mortgage loan servicing company and is the insured and/or authorized agent for the insureds under mortgage insurance policies issued by PMI.  As an authorized agent, PHH is responsible for submitting claims and pursuing claim payments from mortgage insurers.  PHH also has the authority to pursue litigation against mortgage insurers and other third parties handling claims, such as Arch, for their improper claims practices.

4.      During the Great Recession that began in or around 2008, borrowers began to default on their mortgages in record numbers leading to an increase in mortgage insurance claims.  This put extreme financial pressure on mortgage insurance companies, like PMI,

who were faced with having to pay out huge sums under their policies.  In an effort to stave off financial ruin, PMI embarked on a strategy to (1) deny claims in full or (2) where that could not be accomplished, pay less than the full amount owed to its policyholders due to alleged servicing defects related primarily to default servicing and the completion of foreclosure proceedings (hereinafter, to "curtail" or a "curtailment").  As relevant here, these denials and curtailments exposed PHH to its own losses because the owners of the loans sought redress from PHH for the curtailed or denied claim payments.  PMI and Arch were aware that their conduct exposed PHH to these losses.

5.     Ultimately, PMI's strategy failed to save PMI from financial destruction.  In October 2011, the Arizona Department of Insurance placed PMI into rehabilitation and ordered PMI to stop writing new business.  Thereafter, PMI's sole business was, and continues to be collecting premiums on policies still in force, and handling and paying claims.

6.     To fund its runoff operations and ostensibly to pay policyholder claims, PMI entered into a series of transactions with Arch and its affiliated companies.  This included Arch's acquisition of PMI's claims handling platform for use in Arch's own mortgage insurance business.  In addition, in or around January 2014, Arch hired substantially all of PMI's claims handling employees, and PMI and Arch entered into a services agreement whereby Arch took over the handling of PMI's mortgage insurance claims.

7.     Unbeknownst to PHH until recently, Arch not only took over the functional aspects of PMI's claims handling, but also took complete control of the decision-making process from PMI for most of PMI's claims activity without any oversight from PMI with regard to almost all claims.  Arch's control includes, but is not limited to, deciding whether to pay claims and how much to pay.  Only in extremely rare situations does anyone from PMI need to approve a decision by Arch to pay a claim.  Further, PMI is never required to approve decisions by Arch to deny or curtail claims.  In effect, PMI has tossed Arch the keys to the factory and walked out the door, leaving no one behind from PMI to oversee things.

8.     In addition to the services agreement and the acquisition by Arch of PMI's claims handling platform, PHH recently learned that another entity related to Arch entered into a reinsurance arrangement with PMI, covering certain mortgage insurance policies issued by PMI.   Reinsurance is an arrangement where one insurance company (the "reinsurer") agrees to insure certain risks covered by another insurance company.  Under this arrangement, the Arch entity covers one hundred percent of PMI's obligation, while at the same time, Arch is deciding whether and how much PMI should pay under such policies. Thus, Arch has a clear incentive not to authorize claim payments or to limit the amount of payments made under the PMI policies because it, in turn, will bear the cost of the payment.

9.     Since Arch took over the claims handling function, PMI's wrongful claim denials and curtailments increased substantially.  This increase in improper claims handling behavior is attributable to Arch, as Arch is making the claim decisions for PMI.  Moreover, Arch is fully aware that these claim denials and curtailments are improper because the Arch employees formerly worked at PMI and understand PMI's obligations under its mortgage insurance policies.  Further, Arch issues mortgage insurance in its own right so the Arch employees should understand the obligations to act in good faith attendant to insurance companies, and how claims properly should be handled under mortgage insurance policies.

10.     The fact that Arch has taken over the responsibility for claims decisions for PMI and obtained substantial financial incentives in the process does not abrogate the obligations under the PMI Policies that run from PMI to its insured, including the implied covenant of good faith and fair dealing found in every insurance contract.  It remains that Arch's decisions are being made *for* PMI. Thus, when Arch decides to deny or curtail a claim, this decision is communicated by PMI on PMI's own letterhead without any indication of Arch's role in the process.  Consequently, by virtue of Arch's handling of PMI's claims, Arch is aiding and abetting PMI in its breach of the implied covenant of good faith and fair dealing that runs from an insurer to its insured.

11.     As previously mentioned, PHH only recently became aware of the extent of Arch's discretionary authority over PMI's claims handling decisions, as well as the nature of

the reinsurance relationship between Arch and PMI, during the course of separate litigation involving PMI.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Arch by virtue of Arch's business activities in the State of Arizona.

14.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district.

## III.     PARTIES

15.     PHH is a corporation incorporated under the laws of the State of New Jersey and maintains its principal place of business in the State of New Jersey.  PHH services first-lien mortgage loans, including loans insured by PMI that are the subject of this litigation.  In 2019, PHH merged with both Ocwen Loan Servicing, LLC ("Ocwen") and Homeward Residential, Inc., ("Homeward").  Prior to the merger, Ocwen and Homeward serviced loans insured by PMI that are the subject of this litigation.  For reasons described in more detail below, PHH is the servicer, and thus the insured, under the mortgage insurance policies at issue in this litigation.

16.     Upon information and belief, Defendant Arch is a mortgage insurance company incorporated in the State of Delaware and has its principal place of business in the State of North Carolina.  Arch is in the business of issuing mortgage insurance policies for residential home mortgage loans, and is a sophisticated market actor in this area.  In or around 2013-2014, Arch and its affiliates entered into a series of transactions with PMI wherein it acquired PMI's claim handling platform.  By virtue of these agreements, Arch began to make improper claim decisions on behalf of PMI on loans serviced by PHH.  Arch further issued reinsurance on claims for which it decided to pay under the PMI policies.

## IV.    THE BASIS FOR THIS ACTION

### A.    THE MORTGAGE INSURANCE POLICIES

17.    PMI sold "flow" mortgage insurance policies to insure certain first-lien mortgage loans against the risk of borrower default.  Flow policies are intended to cover individual loans submitted for insurance on a loan-by-loan basis.  The loans covered under flow policies are not submitted as part of any pooling arrangement or securitization.  They are submitted for coverage on an individual basis, and coverage for an individual loan is evidenced by a certificate of insurance issued by PMI.  The flow mortgage insurance policies issued by PMI that are at issue in this litigation are subject to the terms and conditions set forth in PMI's Master Policy and any applicable endorsements thereto (hereinafter, the "Flow Policies").

18.    PMI also issued "pool" policies that insure pools, or groups, of residential mortgage loans, certain of which PHH services and that are the subject of this litigation (hereinafter, the "Pool Policies").  Like the Flow Policies, the Pool Policies insure first-lien mortgage loans against the risk of borrower default.  The Flow Policies and Pool Policies are collectively referred to herein as the "Policies."

19.    To this day, when servicing loans for other parties, such as private investors or the Government Sponsored Enterprises ("GSEs"), PHH relies on the promises contained in the Policies that the insurer will pay covered claims in full.  PMI is primarily obligated to these other parties to pay the insurance proceeds.  However, when PMI, acting under Arch's direction and based on Arch's assistance, does not perform under the Policies as promised, the owners of denied or curtailed loans sometimes seek to have PHH repurchase the loan or pay the amount curtailed by PMI and Arch's actions, and such demands cause considerable harm to PHH.  Such harm can, and often does, exceed the insurance policy benefits that PMI (and Arch) have refused to pay.

20.    PHH is authorized to bring this litigation as the Insured and/or the Servicer, on behalf of the owners and/or investors, under the Policies.  In all matters regarding the claims process, PMI and Arch interact with PHH as the Insured, including with respect to providing

notifications to PHH regarding claim determinations and communications with PHH regarding challenges to Arch's claim determinations on behalf of PMI.  Upon information and belief, PMI and Arch generally do not interact directly with private investors or the GSEs with respect to such matters.

21.    The definition of "Servicer" in the Policies generally states that the Servicer is "that Person . . . who at any time is servicing a Loan (as a master servicer, if subservicing is also involved) with respect to the Insured's obligations under the Policy.  **The Insured shall be presumed to be the Servicer unless the Company is notified otherwise.**"  *See*, *e.g.*, PMI Mortgage Ins. Co. First Lien Master Policy No. 3829-1 ("PMI Master Policy"), effective December 11, 1995 § I.MM (emphasis added).  The Policies further provide that the servicer "is deemed to be an agent of the Insured for all purposes under this Policy, including, but not limited to, for receiving notices, payments of Insurance Benefits, settling Claims, and performing acts required under the Insured under this Policy excepting for receipt of notices required under Section III., F., (Non-Approved Servicer)."  *Id.* § VI.J.  The Policies do not place any limitations on the Servicer to act in its role as the Insured or an agent of the Insured.  Thus, as the Servicer of the subject loans, PHH is the Insured and/or is an agent of the Insured, and thus has the authority like any insured to bring this litigation against Arch for aiding and abetting PMI's bad faith conduct and causing PMI's failure to pay in full valid claims submitted under the Policies.

22.    PMI received all required premiums under the Policies for the loans subject to this dispute, and continues to receive premiums on an ongoing basis for insured loans that are performing.  Since PMI and Arch entered into certain agreements in or around 2013-2014, including the services agreement and reinsurance arrangement, PMI and Arch began to share in the premiums received on performing loans insured by PMI.  Upon information and belief, some of the claims at issue in this litigation involve covered loans where both Arch and PMI received premiums payments.  Upon further information and belief, the portion of the premium payments that are received by Arch constitute income to Arch and are not used for purposes of funding the payment of claims under PMI's Policies.

23.     PHH has performed all material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the Policies, and is and has been at all times, ready, willing, and able to perform all conditions required to be performed in accordance with the terms and conditions of the Policies.

**B.     THE GREAT RECESSION**

24.     In the mid-2000s, when the real estate market was flourishing, PMI, along with other mortgage insurers, engaged in aggressive marketing campaigns to convince lenders to purchase its mortgage insurance products and services rather than those of its competitors.

25.     Mortgage insurance was marketed as the means to protect lenders from the volatility of the mortgage market.   The now defunct Mortgage Insurance Companies of America ("MICA"), of which PMI was a member, explained that "[r]ecent trends in industry profitability provide a graphic picture of the cyclical risks of mortgage lending.  It is against this pattern of peaks and valleys that mortgage insurance was designed to protect lenders." MICA 2001-2002 Fact Book & Membership Directory at 19.  MICA further recognized that "[m]ortgage insurers cannot raise premiums or cancel policies if risk increases over time." *Id.* at 10.

26.     As is now common knowledge, the once booming housing market collapsed. Throughout 2007, real estate prices flattened and began to decrease nationally in the first sustained nationwide home-price depreciation since the Great Depression, leading to substantial increases in default and foreclosure rates.  Active participants in the real estate and mortgage markets, including PMI, were well aware of theses market conditions, and the popular press was full of news of a "mortgage crisis."

27.     The United States economy spiraled downward into an economic recession. The decreases in home prices resulted in many homeowners finding themselves in a position of negative equity, *i.e.*, these borrowers had mortgage debt higher than the value of the property.  In addition to the collapse of the real estate market, employers had downsized, eliminating millions of employees and decreasing existing employees' salaries.  According to the United States Labor Department, by December 2009, the unemployment rate rose to

10.0%, and the number of unemployed persons was 15.3 million, the highest level in decades.

28.     As a result of the economic recession, there was a dramatic increase in defaults on residential mortgage loans, not just in isolated geographic areas, but across the entire country; a situation mortgage insurers, like PMI, did not account for in their loss modeling. From 2005 to 2008 alone, approximately 1.2 million homeowners lost their homes due to the recession.

### C.    PROPER SUBMISSION OF CLAIMS FOR COVERAGE

29.     After the collapse of the real estate market, the number of claims submitted to PMI for loans in default increased sharply for all lenders.  The increase in defaults was not limited to loans serviced by PHH, but was a phenomenon that occurred nationwide and impacted all mortgage lenders and servicers.  This risk of default is exactly the type of risk PMI agreed to insure.

30.     Loans insured under the Policies have been and continue to be in default as that term is defined in the Policies.

31.     Pursuant to the terms and conditions of the Policies, PHH timely submitted a claim and proof of loss for each of the loans in default for which a claim was filed.

32.     The claims and proofs of loss that were submitted for the loans insured under the Policies include documentation that complies with the applicable terms and conditions of the Policies or, at a minimum, substantially complies with the applicable terms and conditions of the Policies, which is all that is required under the law.

33.     Pursuant to the terms and conditions of the Policies, PHH diligently pursued what the Policies call "Appropriate Proceedings" and/or attempted to mitigate loss for each of the loans in default.

34.     PHH's efforts in pursuing Appropriate Proceedings and/or mitigating loss comply with the applicable terms and conditions of the Policies or, at a minimum, substantially comply with the applicable terms and conditions of the Policies, which is all that is required under the law.

### D.   PMI'S IMPROPER CLAIMS HANDLING

35.    Despite PHH's compliance or substantial compliance with the applicable terms and conditions of the Policies, PMI attempted to escape its coverage obligations by taking unreasonable positions in its claims handling and/or engaging in improper post-loss underwriting in order to improperly deny or curtail valid claims that should have been paid in full.

36.    In an effort to save its bottom line, PMI began to improperly deny or deduct amounts from claim payments that PMI agreed were otherwise covered under its Policies on the basis that there had been delay(s) in the servicing. PMI's efforts to deny or curtail covered claim payments were not only improper, but were also inconsistent with the way it processed claims before the economy collapsed and the number of claims increased significantly. For example, in 2005, PMI curtailed just over 1% of the total amount of claims submitted. By contrast, in 2013, PMI curtailed approximately 9% of the total amount of claims submitted that year.

37.    Indeed, PMI knew the positions it was taking with respect to coverage were unreasonable and made in bad faith, and therefore warned its investors that it may face significant exposure if the courts disagreed with its interpretation of the Policies.

38.    In its Form 10-K filed for the fiscal year ending December 31, 2010, PMI recognized: "Beginning in 2010, claim denial activity also includes claims denied or curtailed as a result of servicers' failure to adhere to customary standards relating to the servicing of delinquent loans ('servicer-related claim denials'). We expect the number of servicer-related claim denials to significantly increase in 2011, and in 2010, we increased our assumptions of future claim denials. Our projection of future claim denials . . . is continuing to reduce, our loss reserve estimates." PMI Group, Inc., Annual Report (Form 10-K), at 49 (Mar. 11, 2010). PMI also warned investors that its new curtailment practices had not been tested, stating "[t]o date, we have not received material challenges to our documentation and servicer-related claim denials. However, there can be no assurance that we will not receive significant challenges in the future or that such challenges will not result in disputes with our

customers. **Our claim denial practices have not been subject to judicial interpretation; therefore, it is unclear whether a court would adopt the same interpretation of our rights as we do. If we are not successful in defending our claim denials, we could be required to pay significant additional amounts in claims, which could materially harm our financial condition and results of operations.**" *Id.* at 50 (emphasis added).

**E.    PMI IS PLACED INTO RECEIVERSHIP**

39.    In the end, PMI's bad faith efforts were unsuccessful and on October 20, 2011, the Director of the Arizona Department of Insurance (the "Director") filed a Complaint to place PMI into receivership in Arizona.   *See* Verified Complaint for Appointment of Receiver & Injunction, *State ex rel. Urias v. PMI Mortgage Ins. Co.*, No. CV2011-018944 (Ariz. Super. Ct. Maricopa County Oct. 20, 2011) (the "Receivership Case").

40.    On March 14, 2012, PMI was placed in rehabilitation by entry of the Order for Appointment of Receiver and Injunction in the Receivership Case (the "Rehabilitation Order").   Pursuant to the Rehabilitation Order, the court required the Director, as Receiver, to take possession and control of PMI, which had been under the formal supervision of the insurance department since August 19, 2011.

41.    PMI was ordered to stop writing new business.   Since the entry of the Rehabilitation Order, PMI's sole business is collecting premiums on policies still in force, and handling and paying claims.

**F.    ARCH AND PMI ENTER INTO A SERIES OF AGREEMENTS AUTHORIZING ARCH TO: (1) REINSURE PMI'S LOANS; AND (2) ASSUME PMI'S CLAIMS HANDLING RESPONSIBILITIES**

42.    On February 7, 2013, Arch, Arch Capital Group (US) Inc. ("Arch Capital"), the parent corporation of Arch, and PMI entered into an Asset Purchase Agreement (the "APA").

43.    On February 8, 2013, PMI's Receiver submitted Petition No. 24, in the Receivership Case, seeking an order approving the APA, among other agreements and related transaction documents, with the court overseeing PMI's rehabilitation (the

"Receivership Court").   Thereafter, Arch Capital and PMI amended the APA and, consequently, filed the Supplement to Petition No. 24.

44.     On June 20, 2013, the Receivership Court granted the relief requested in Petition No. 24 and the Supplement to Petition No. 24, ordering:

> The Asset Purchase Agreement, as amended, the Stock Purchase Agreement, as amended, and the Related Transactions Documents, as amended, including, but not limited to, the Joint Sales Agreement, the PMI Quota Share Reinsurance Agreement, and the Services Agreement, and all the other Agreements, and the transactions contemplated thereby, are authorized and approved.

45.     As noted in the Receivership Court's order, the Related Transactions Documents included, as relevant here, the PMI Quota Share Reinsurance Agreement (the "Reinsurance Agreement") and the Services Agreement.

### 1.     The Reinsurance Agreement

46.     Under the Reinsurance Agreement, Arch Capital and PMI agreed to enter into a 100% quota share reinsurance agreement for non-delinquent 2009-2011 policies, effective July 1, 2012.  Arch Capital further agreed to pay PMI a $90 million ceding commission in exchange for the transfer of unearned premiums and PMI's book of business from July 1, 2012 to the Reinsurance Agreement's closing date of February 7, 2013.

47.     Following closing, Arch Capital agreed to reimburse PMI for 100% of claim payments on the reinsured book up to a potential losses cap percentage of 75% of total ceded premiums.   PMI agreed to continue to pay cash payment percentage amounts to all policyholders, which included PHH.

48.     Further, under the Reinsurance Agreement, PMI maintained a 10.5% ceded commission on future premiums.  Upon information and belief, the balance of unearned premiums was transferred to Arch.  Upon further information and belief, by providing Arch with a large percentage of the unearned premiums, Arch was incentivized to increase

curtailments and denials in order to bolster its bottom line and extend the PMI run-off (and, by proxy, its collection of premiums).

49.     In the Supplement to Petition No. 24, the Receiver estimated the ceded income to Arch Capital to be $26 million. The Receiver had previously estimated, in Petition No. 24, that ceded income was somewhere between $28 million and $68 million. The basis for these significant discrepancies in projected ceded income is unknown.

50.     Upon information and belief, since the Receivership's Order granting Petition No. 24, Arch Capital has been reimbursing PMI for all claims paid under PMI's 2009-2011 policies that were non-delinquent between July 1, 2012 and February 8, 2013.  Upon further information and belief, Arch Capital has received millions of dollars in premiums on loans subject to the Reinsurance Agreement.

### 2.     The Services Agreement

51.     On January 30, 2014, PMI, Arch, and Arch Capital entered into the Services Agreement.

52.     Under the terms of the Services Agreement, Arch agreed to "provide support services to PMI during and for the runoff of PMI's legacy insurance portfolio[.]"

53.     The Services Agreement defines "PMI Customers" to include the "holders of PMI's master policies of mortgage insurance or, purchasers of, or investors in, mortgage loans insured under such master policies and their respective agents including mortgage loan servicers."

54.     Section 2.2 of the Services Agreement requires Arch to "provide the Services and perform its other obligations in a non-discriminatory matter that is generally consistent, in all material respects, with the manner in which such Services or obligations are provided or performed for [Arch] and its Affiliates' own U.S. mortgage insurance business operations, including with respect to compliance with applicable Law, as in effect at the time such Services are provided or such obligations are performed . . ."

55.     Under the Services Agreement, Arch is an "independent contractor" that "maintain[s] complete control over its Personal and its own operations."  While Arch "may

receive direction from PMI as to the end results[,]" Arch has "sole control over the manner and means of accomplishing the work to be performed."

56.    By its own terms, the Services Agreement is governed by Arizona law.

57.    In or around the time the Services Agreement went into effect, Arch hired substantially all of PMI's claims handling employees.  Upon information and belief, these new Arch employees not only handle PMI claims but also claims under mortgage insurance policies issued by Arch.

58.    In or around 2017, Arch amended the fee structure in the Services Agreement. Under the new fee calculation, Arch began to receive, in addition to a base payment, 9.25% of PMI's consolidated gross premiums paid for the applicable month.  Upon information and belief, this change in payment methodology further incentivized Arch to increase curtailments and denials in order to prolong the run-off of PMI and, by proxy, extend the period for which Arch will receive premiums from loans insured under the Policies that continue to perform.

59.    Furthermore, under both the initial Services Agreement and the later amendments thereto, Arch has received and, on information and belief, continues to receive certain cash payments for its claims handling services.  Upon information and belief, these payments have incentivized Arch to increase denials and curtailments in order to prolong PMI's run-off and, by proxy, its receipt of payments under the Services Agreement.

60.    Upon information and belief, Arch has received millions of dollars from PMI as payment under the Services Agreement for its work performed from January 2014 to the present.  Arch also has taken advantage of its engagement with PMI to generate customers for its own mortgage insurance business.

**G.    ARCH'S ASSUMPTION AND EXPANSION OF PMI'S IMPROPER CLAIMS HANDLING**

61.    Since Arch took over claims handling responsibility for PMI in 2014, PHH has experienced a significant increase in the rates of curtailments and denials under the Policies.

Therefore, not only did Arch inherit PMI's bad faith practices when it took over PMI's claim handling function, but it expanded on those practices in order to benefit its own bottom line.

62.     This increase is attributable to Arch as Arch controls the claim decisions, not just claims handling, for PMI.  For example, in 2013, when the claims handling practice was still under the control of PMI, PMI curtailed approximately 9% of the total submitted claims amount that year.   In 2014, when Arch took over claims handling, Arch increased the curtailment rate to 13% of the total submitted claims amount for that year.  By 2015, the rate increased again to nearly 15% of the total submitted claims amount.

### 1.     Improper Curtailment of Covered Claims Directed by Arch

63.     Like PMI before it, Arch has sought to exploit the poorly drafted Policies by wrongfully interpreting its opaque provisions to its benefit in order to effectuate its wrongful curtailments.

64.     On information and belief, like PMI, the principal provision Arch relies upon to execute this strategy is the Appropriate Proceedings provision. The Policies' Appropriate Proceedings provision, in relevant part, provides:

> The Insured MUST begin Appropriate Proceedings when the Loan becomes six (6) months in Default unless [PMI] provides written instructions that some other action be taken.   [PMI] reserves the right to direct the Insured to institute Appropriate Proceedings at any time after Default.   When either defending against or bringing Appropriate Proceedings, the Insured shall report the status of these proceedings to [PMI] as reasonably and expeditiously as possible.
>
> In conducting Appropriate Proceedings, the Insured shall:
>
> 1. Diligently pursue the Appropriate Proceedings once they have begun[.]

PMI Master Policy § IV.E.

65.    The Policies do not require PHH to commence Appropriate Proceedings before the Loan becomes six (6) months in Default.  The Policies do not define what it means to "diligently pursue" Appropriate Proceedings.  And the Policies do not specify any timeframe by when PHH must complete Appropriate Proceedings.  Further, while the Appropriate Proceedings provision is drafted broadly to include, for example, *any* step that enforces the terms of a Loan, Arch narrowly interprets this term to mean foreclosure proceedings only.

66.    There are no express provisions in the Policies that authorize PMI, or Arch purporting to act on PMI's behalf, to curtail claims for purported delays made by PHH in commencing, pursuing, or completing Appropriate Proceedings.

67.    The only provisions in the Policies that are potentially applicable to curtailment of claims are the Negligence exclusion and the Mitigation of Loss provision. However, both these provisions place clear burdens on PMI (or Arch acting on PMI's behalf) to either show that the negligence was material and increased the Loss or to attempt to mitigate the loss itself.  PMI (or Arch acting on PMI's behalf) has not satisfied its burden under either the Negligence exclusion or the Mitigation of Loss provision for any of the loans at issue in this litigation.

68.    The Negligence exclusion precludes coverage for:

> any Claim involving or arising out of the negligence of the Insured or the Servicer, which negligence is material either to the acceptance of the risk or to the hazard assumed by [PMI].

PMI Master Policy § III.E.

69.    The Policies further clarify that "if the damage to [PMI] arising from an excluded event can be reasonably quantified, [PMI] shall adjust the Claim Amount by the amount of such damage rather than exclude coverage altogether for such Loan . . . ." *Id.* § III.

70.    Thus, by the express terms in its Policies, Arch cannot curtail a claim unless it proves that PHH was negligent, that such negligence was "material either to the acceptance of the risk or to the hazard assumed" by PMI and that PHH's negligence increased the Loss.

71.     The Mitigation of Loss provision, in pertinent part, provides:

The Insured and its Servicer shall attempt to limit and mitigate loss by adhering to customary servicing standards applicable to delinquent Loans, which may include in appropriate cases, but is not limited to, trying to obtain a cure of Defaults and trying to effectuate a Pre-Arranged Sale or voluntary conveyance of the Property.   The Insured shall permit [PMI] to participate in workout activities for any Loan in Default.  Failure of the Insured to materially comply with this Section II., N., with respect to any Loan shall entitle [PMI] to adjust the Claim Amount by the amount [PMI] was damaged by such noncompliance.   [PMI] shall attempt to limit and mitigate any loss to the Insured which will not be covered by the Insurance Benefit provided under this Policy.

PMI Master Policy § II.N.

72.     The Policies do not define "customary servicing standards."

73.     To fill in the gaps created by its Policies and to justify its excessive and inappropriate curtailment rate, PMI unilaterally introduced a self-serving servicing standards guide in or around December 2010 (the "2010 Guide").

74.     The 2010 Guide, however, has never been incorporated into the Policies and does not bind PHH.

75.     Further, the 2010 Guide, and any later amendments thereto, fails to properly account for servicing delays imposed by applicable law and industry standards designed to protect distressed homeowners, and conflicts with relevant provisions in its Policies.   In addition, the self-imposed servicing standards guide does not properly account for delays beyond a servicer's control such as a borrower's change in financial circumstances requiring re-review of eligibility for workout programs, gaps and/or delays in borrower

documentation, court delays, borrower litigation, or title issues that could result in extended default servicing and/or foreclosure timelines.

76.    Upon information and belief, since 2014, Arch continues to have the 2010 Guide in operation despite its obvious flaws.

77.    Upon information and belief, Arch seeks to rely upon the Appropriate Proceedings provision to curtail claims, despite it not providing the authority to do so. Arch has relied on this provision instead of the Negligence and Mitigation of Loss provisions in order to reap the financial benefits of curtailments without any of the attendant burdens that come with the latter provisions.

78.    Upon information and belief, since 2014, Arch has also relied upon the PMI internal guidelines to justify its curtailments, which were implemented by the former PMI employees that joined Arch. To date, Arch has failed to share these guidelines with PHH. Upon information and belief, these internal guidelines are believed to be both subjective and arbitrary depending on the Arch claims handler (previously at PMI) reviewing any given loan, and present a moving target for Servicers, including PHH.  This understanding of the internal guidelines is derived, in part, from the subject and arbitrary handling of claims submitted under the Policies by PHH.  Upon information and belief, since 2014, Arch claims handlers who process claims submitted under the Policies, on behalf of PMI, continue to apply the subjective and arbitrary internal guidelines developed at PMI to Arch's benefit.

79.    The bad faith curtailment practices that Arch adopted from PMI and subsequently expanded upon, also conflict with Arizona law, which requires that the insurer provide a "reasonable explanation of the basis in the insurance policy" when denying or curtailing a claim. *See* A.R.S. § 20-461 (A)(15).  Upon information and belief, Arch does not cite to any policy provisions when denying or curtailing a claim in breach of Arizona law. Instead, these decisions are completely *ad hoc* and significantly diverge from industry practice. Arch's rejection of industry norms and guidance is reflected in their bad faith claims practices. Upon information and belief, these include, among other things, failing to track the average time it takes to transfer title in specific regions and failing to credit

servicers where title is transferred faster than the average for the area.  Upon information and belief, Arch's claims handlers, formerly of PMI, spend minimal time looking at each claim and, what little time they do spend, is focused on identifying opportunities to curtail or deny rather than maximize the coverage payment owed.

80.    Since in or around January 2014, PMI's refusal to pay the full claim amount owed, at Arch's direction, has nothing to do with PHH's loan servicing practices and everything to do with Arch's efforts to preserve capital and to avoid reimbursing PMI.

81.    PHH has also sought to hold PMI liable for its bad faith conduct. As PMI's Receivership Order, however, enjoins certain claims, such as tort claims, PHH has been precluded from pursuing its bad faith action against PMI at this time.  In precluding the bad faith claim, the Receivership Court reasoned that the PMI estate should not "spend time or money to defend claims that will never be paid."  Such a finding here, however, does not rule out that PMI did, in fact, engage in bad faith.  Moreover, such a finding has no bearing on Arch's ability to be held accountable for its aiding and abetting of PMI's tortious conduct.

82.    As a result of the wrongful curtailment of claims under the Policies at Arch's direction, PHH and its investors have suffered damage and will continue to suffer damage. For example, Arch's wrongful curtailments have also led to repurchase demands and other claims made to PHH by various third-parties, and PHH has had to incur substantial sums to deal not only with these curtailments, but also respond to the repurchase demands and other claims that have been made.  PHH is thus entitled to damages for Arch's aiding and abetting of PMI's tortious conduct.

## 2.    Improper Claim Denials Directed by Arch

83.    Upon information and belief, since taking over PMI's claims decisions, Arch has adopted in full PMI's practice of improper claim denials. As with curtailments, following the onset of the Great Recession, PMI also began asserting improper reasons when denying coverage without any factual or legal support, based on improper interpretations of the Policies, and inconsistent with the way it processed claims before the economy collapsed and

the number of claims increased significantly.  Upon information and belief, Arch has followed upon and expanded the improper claim denial path laid by PMI to its benefit.

84.    For example, Arch has wrongfully denied claims because it contends it did not receive all documentation it requested in order to evaluate coverage.  These unreasonable assertions were made even though the documents Arch claims it needed were not required to be obtained at origination under the applicable guidelines, are not reasonably required in order to reach a claim determination, and/or the information contained in the allegedly missing documents can be obtained from other sources upon a good faith investigation by Arch on PMI's behalf.  Rather, these assertions arose from Arch's *post hoc* effort to impermissibly shield itself from exposure to having to reimburse PMI for valid claims.

85.    Since 2014, these denials, orchestrated by Arch, have led to repurchase demands and other claims made to PHH by various third-party investors.  PHH has had to incur substantial sums to deal with the denials, but also respond to the repurchase demands and other claims that have been made.

86.    PHH and its investors suffered damage as a result of these improper denials, which are in breach of the Policies, and in bad faith.  Moreover, because Arch has not only adopted PMI's practice of bad faith claim denials but has increased the practice, PHH and its investors will continue to suffer damage on an ongoing basis as a result of these improper claim denials by Arch.

87.    PHH expects that Arch, purporting to act on behalf of PMI, will continue to deny claims based on improper and incorrect interpretations of the Policies in order to justify its wrongful and bad faith conduct.

### 3.    Arch Knows PMI's Conduct Constitutes Bad Faith.

88.    Arch is fully aware that its denials and curtailments of PMI claims are improper for a myriad of reasons, including that:

a.    Arch employees used to work at PMI and understand PMI's obligations under its mortgage insurance policies;

b.   Arch itself issues mortgage insurance and its employees should understand: (i) the obligations to act in good faith imposed by law on insurance companies; and (ii) how this obligation of good faith along with numerous other legal requirements dictates how claims should be handled under mortgage insurance policies.

89.   Based on this, Arch knows that its claims handling practices and decision making as it relates to PMI claims are improper.

90.   Arch is also not without motive for this bad faith claims handling.  Under the Reinsurance Agreement, Arch has a clear incentive to implement high rates of curtailments and denials on claims submitted under the Polices.  Every dollar involved in claims that are denied, or curtailed on claims covered by the reinsurance agreement, is a dollar that Arch is not obligated to pay back to PMI under the reinsurance agreement.  Upon information and belief, the Arch employees handling the PMI claims do not know which claims are subject to the Reinsurance Agreement, and thus have a clear motivation to limit claim payments as to all PMI claims. As illustrated above, this arrangement has created a disastrous result with insureds and/or servicers under the Policies left to bear the financial consequences.

91.   Furthermore, upon information and belief, Arch's entitlement to unearned premiums, under both the Reinsurance Agreement and Services Agreement, as well as direct payments for its claims handling under the Services Agreement, has incentivized Arch to increase curtailments and denials in order to extend the PMI run-off (and, by proxy, its collection of premiums and Services Agreement payments).  Upon information and belief, as demonstrated by the increase in denials and curtailments, these incentives, whether intentional or inadvertent, are working.

### H.   PHH DISCOVERS THE EXTENT OF ARCH'S CONTROL

92.   Although general announcements were made that Arch and PMI had entered into the Services Agreement in January 2014, neither Arch nor PMI disclosed that Arch would have complete discretion over PMI's claims decisions and PHH did not learn the

extent of Arch's involvement and control until late February 2021 during separate litigation with PMI.

93.    In February 2021, PHH learned for the first time that since 2014, Arch was not only responsible for the mechanical aspects of the claims handling, but also has been almost entirely responsible for making all decisions regarding whether to pay in full, deny, or curtail a claim submitted by PHH under the Policies.

94.    At this time, PHH also learned that PMI maintains almost no oversight over Arch's decisions to deny claims and virtually no oversight over claims with curtailed payments.

95.    For example, PMI does not monitor the amounts that Arch curtails on each claim submitted under the Policies, meaning that Arch could curtail 99% of the claim amount without having to seek PMI's approval or even alert PMI to its decision.  While Arch may argue that an insurance company adjusting a claim it insures has a similar absence of oversight, there is one key distinction: the average insurer looks to maintain its business by continuing to write insurance, and egregious claims handling and decision making will drive that business away.  Here, PMI is no longer writing insurance so there is no business concern reigning in its bad faith claims handling practices and decision making. Moreover, Arch has been able to benefit from this fact and thereby act with impunity when wrongfully curtailing or denying a PMI claim.

96.    PHH is bringing this litigation with respect to all of the improper denials and curtailments that PMI issued and will continue to issue under the Policies through Arch's actions.

**FIRST CAUSE OF ACTION:  AIDING AND ABETTING TORTIOUS CONDUCT**

97.    PHH re-alleges Paragraphs 1 through 96 as if fully set forth herein.

98.    As alleged above, PMI agreed under the terms and conditions of the Policies to insure the owners of the loans for losses due to default by borrowers in the repayment of loans.  Arch, in turn, agreed to reinsure PMI for any losses it sustained for claims submitted under the Policies.

99.     PHH has timely submitted valid claims under the Policies, as acknowledged by PMI and Arch.

100.    Implied in every insurance policy is a covenant that the insurance company will act in good faith and deal fairly with its insured, that the insurance company will do nothing to interfere with the right to receive benefits under the policy, that the insurance company will give at least as much consideration to the interests of the insured as it does its own interests, that the insurance company will exercise diligence, good faith and fidelity in safeguarding the insured's interests, that it will deal ethically with the insured and will fairly and adequately inform the insured with respect to the nature and scope of its insurance coverage (hereinafter referred to as the "implied duty of good faith and fair dealing").

101.    By virtue of the Services Agreement and Reinsurance Agreement, and attendant financial incentives, Arch was motived to, and did in fact aid and abet PMI in its refusal to acknowledge the coverage provided under the Policies, by improperly denying claims and by improperly deducting amounts from claims that PMI agrees are covered for reasons that are unsubstantiated under the terms and conditions of the Policies, in breach of the implied duty of good faith and fair dealing.  Arch aided and abetted PMI in its intentional withholding of policy benefits, without a reasonable basis, and purposefully placing its own interests above those of its insured's for the purpose of utilizing money, which is owed under the terms and conditions of the Policies.

102.    PHH, as Servicer, is informed and believes, and on that basis alleges, that Arch aided and abetted PMI's persistent and systematic actions and failures to act were done purposefully, intentionally, maliciously, and/or with reckless disregard of its obligations under the Policies, that PMI's conduct was despicable and intended to cause injury to PHH, as Servicer, and deprive it of its rights under the Policies, and that PMI's actions and inactions have been taken with willful and conscious disregard of PHH's rights and the consequences of these actions on PHH, and with the deliberate intent to vex, injure and annoy PHH and advance PMI's own pecuniary interest and, since 2014, Arch's pecuniary interests as well.

103.    As a result of PMI's bad faith denials and curtailments, at Arch's direction, PHH has suffered substantial monetary damages in addition to the damages from unpaid claims.

104.    On information and belief, Arch knew that PMI's conduct constitutes a breach of implied duty of good faith and fair dealing.  Arch obtained this knowledge in numerous ways, including but not limited to:

    a.  Arch's employment of PMI personnel who understood PMI's obligations under the mortgage insurance policies; and

    b.   Arch's independent knowledge of good faith claims handling as imposed upon Arch as an insurer of mortgage loans and the complete failure of PMI's practices, which Arch adopted as to the PMI claims, to conform with these standards.

105.    Despite this information, Arch materially adopted PMI's bad faith claims handling practices by refusing, on behalf of PMI, to fully pay the valid claims submitted by PHH for such losses by, among other things:

    a.  failing to deal fairly with PHH and failing to give equal consideration in all matters to PHH's and/or other Insureds' interests;

    b.  engaging in unreasonable, frivolous, or untenable denial of policy benefits;

    c.  misrepresenting pertinent facts or policy provisions relating to coverages at issue;

    d.  asserting inconsistent positions regarding the meaning of its policy provisions and adopting the coverage-limiting interpretation as the correct one;

    e.  compelling PHH to institute, continue, or submit to litigation to recover amounts due under the Policies;

    f.  failing to provide a reasonable explanation of the basis for its various insurance coverage positions;

     g.  failing to promptly settle certain claims, where liability has become reasonably clear in order to influence settlements as to other claims where liability may be reasonably contested;

     h.  denying claims based on perceived claim perfection defects that are unreasonable and not required by the Policies;

     i.  imposing time limitations for completing foreclosures or other servicing activities that are unreasonable, in violation of federal or state law, and/or not specified in the Policies; and

     j.  consciously curtailing claim payments for reasons that are unfounded in a misguided attempt to limit Arch's exposure to the claims at issue.

106. Arch has substantially assisted and/or encouraged and continues to substantially assist and/or encourage PMI in the achievement of its breach of the implied duty of good faith and fair dealing owed to PHH, including in PMI's wrongful denial and/or curtailment of claims without a reasonable basis. Moreover, the wrongful denials and curtailments of claims submitted under the Policies substantially increased upon Arch's assumption of PMI's claims handling and decision-making duties from approximately 9% in 2013, under PMI, to nearly 15% by mid-2015 under Arch.

107. Arch had a clear incentive to encourage and/or assist PMI's breach of the implied duty of good faith and fair dealing through the Reinsurance Agreement, which made Arch liable, in certain instances, to reimburse PMI for claims paid under its Policies.

108. In addition, Arch's entitlement to unearned premiums, under both the Reinsurance Agreement and Services Agreement, as well as direct payments for its claims handling under the Services Agreement, has incentivized Arch to increase curtailments and denials in order to extend the PMI run-off and, by proxy, its collection of premiums and Services Agreement payments.

109. As a result of Arch's aiding and abetting of PMI's bad faith denials and curtailments, PHH is entitled to punitive damages.

**SECOND CAUSE OF ACTION:  EQUITABLE INDEMNIFICATION**

110.    PHH re-alleges Paragraphs 1 through 109 as if fully set forth herein.

111.    PMI is obligated to pay mortgage insurance claims for the benefit of certain third party owners of insured loans, serviced by PHH, such as Fannie Mae and Freddie Mac, under the Policies.

112.    As a result of Arch's wrongful claim denials and claim curtailments of claims submitted under the Policies, these third parties have requested that PHH compensate them as a result of Arch's failure to pay claims in full.

113.    Based on the doctrine of equitable indemnification, PHH seeks indemnification from Arch for any sums PHH was forced to pay to these loan owners in compensation for Arch's failures to fulfill its contractual obligation to pay claims in full under the Policies.

**THIRD CAUSE OF ACTION:  UNJUST ENRICHMENT**

114.    PHH re-alleges Paragraphs 1 through 113 as if fully set forth herein.

115.    Arch has been unjustly enriched through its complete control over PMI's claims handling and decision-making functions.   In particular, Arch directed PMI to wrongfully deny and curtail PHH's claims in order to avoid its reimbursement responsibilities to PMI under the Reinsurance Agreement and thus limit its own financial obligations.

116.    Arch's unjust enrichment impoverished PHH by depriving it of amounts owed under the policies.

117.    PHH's impoverishment directly resulted from Arch's unlawful claims decisions on behalf of PMI.

118.    There is no justification for Arch's conduct.

119.    PHH has no available remedy at law in order to address this unjust enrichment.

120.    By virtue of the foregoing, this Court should exercise its equitable powers to correct Arch's unjust enrichment by requiring it to disgorge the benefits it obtained at PHH's expense for those claims that were subject to the Reinsurance Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, PHH requests judgment as follows:

1.     With respect to the First Cause of Action, PHH requests that the Court enter judgment against Arch for actual money damages in an amount to be proven at trial, including compensatory damages in the amount of unpaid insurance claims, consequential damages, punitive damages, pre-judgment and post-judgment interest as allowed by law, attorneys' fees as allowed by law, and other such relief the Court deems just and proper.

2.     With respect to the Second Cause of Action, PHH requests that the Court enter judgment against Arch for equitable indemnification of any sums PHH was forced to pay certain loan owners in compensation for Arch's wrongful denials, or curtailments of claim payments, pre-judgment and post-judgment interest as allowed by law, attorneys' fees as allowed by law, and other such relief the Court deems just and proper.

3.     With respect to the Third Cause of Action, PHH requests that the Court enter judgment against Arch to disgorge the benefits it obtained at PHH's expense for those claims that were subject to the reinsurance agreement, pre-judgment and post-judgment interest as allowable by law, attorneys' fees as allowed by law, and such other relief as the Court deems just and appropriate.

Dated: September 3, 2021

By: /s/ Gerald Maltz _____

Gerald Maltz (004908)
Stanley G. Feldman (000838)
**Miller, Pitt, Feldman & McAnally, PC**
One South Church Avenue, Suite 1000
Tucson, AZ  85701
Phone:  520.792.3836
Fax:  520.792.3836
Email:  sfeldman@mpfmlaw.com
          gmaltz@mpfmlaw.com

David M. Halbreich (*pro hac vice pending*)
David E. Weiss (*pro hac vice pending*)
Matthew D. Rosso (*pro hac vice pending*)
Margaret McDonald (*pro hac vice pending*)
**Reed Smith LLP**
355 South Grand Avenue, Suite. 2900
Los Angeles, CA 90071
Phone:  213.457.8033
Fax:  213.457.8080

*Attorneys for PHH Mortgage Corporation*